**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence GASTON, Defendant-Appellant.**

No. 79–2222.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 29, 1980.

Decided May 5, 1980.

James H. Connors, Madison, Wis., for defendant-appellant.

Frank M. Tuerkheimer, U. S. Atty., Madison, Wis., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT and SPRECHER, Circuit Judges.

PER CURIAM.

Defendant-appellant, Lawrence Gaston, appeals from a judgment of conviction after a bench trial on one count of conspiracy to

possess stolen mail, to transport forged securities in interstate commerce, and to cause financial institutions to transport negotiated forged securities in interstate commerce and a second count of transporting fifteen forged securities in interstate commerce. On appeal, Gaston contends that his warrantless arrest was without probable cause and therefore the evidence seized pursuant to the arrest should have been suppressed. We reject Gaston's contention and affirm the judgment of the district court.

## I

Gaston challenges his arrest and the subsequent seizure of forged checks and stolen mail. A suppression hearing was held and demonstrated the following: Postal inspectors in Chicago had been investigating a scheme which involved the theft of mail from collection boxes and cashing of forged commercial checks. Specifically, the scheme involved the theft of personal checks from mail collection boxes. The information obtained from these checks would then be used to complete blank commercial checks which had been stolen or obtained in blank by some other means.[1] The commercial check would be made payable to the individual whose checks initially had been stolen from the mail collection boxes. The individual's name would be typed in as the payee and the amount of the check typically would range from $450 to $490. Someone involved in the scheme would then forge the payee's indorsement on the commercial check (having obtained this signature from the stolen mail) and present the check at the individual's bank for either cashing or a minimal deposit and cash return.

Postal inspector James Wachuta investigated the scheme and conducted several interviews. During the summer of 1978, Wachuta interviewed Cecelia Galloway. Galloway's blank personal checks had been stolen and made out to an individual whose mail had been stolen. Galloway told Wachuta that she shared an apartment with Sheila Clark and identified several of Clark's friends who had access to these blank checks. The defendant Gaston was one individual mentioned as having access.

Wachuta also interviewed Patricia Jackson. Jackson was contacted because the license number on her car was written on the back of one of the stolen checks that had been cashed. Jackson told Wachuta that many people used her car. During the interview, a man came into the apartment and asked what was being discussed.[2] When told that the use of Jackson's car was being discussed, the man and Jackson ended the interview. Wachuta identified this man as the defendant Gaston.

Also during the summer of 1978, Wachuta interviewed Steve McMillan. McMillan had been arrested on local charges and agreed to cooperate if the local charges were dropped. Thereafter, McMillan told Wachuta that he, Gaston, and others had managed to obtain entry to several mail collection boxes in the Chicago area.[3]

In January 1979, Postal Inspector Martin Walsh assumed the responsibility of coordinating the investigation of this scheme. Wachuta informed Walsh as to the information he had obtained through the interviews described above. Also, Walsh learned that the scheme extended beyond Chicago to Rockford, DeKalb, Freeport, Peoria, Kankakee, Joliet, and Champaign-Urbana. Walsh was able to link these cashings with the Chicago scheme because the checks were made out to individuals whose mail had been stolen and by the fact that the drawers of the checks were the same as those on the checks passed in the Chicago area.

In February 1979, one of Gaston's co-defendants, Rose Covert, was arrested in Northbrook for passing a forged commercial check. The passing fit the scheme

---

1. Personal checks, as well as commercial checks, sometimes were used in the scheme.

2. The man identified himself as Jackson's brother.

3. The charges were dropped and after several weeks of cooperating, McMillan disappeared.

which had existed the previous year—that is, the payee of the check had her mail stolen a day or two before the check was passed. After her arrest, Covert called Gaston to make bond.

In March 1979, information was obtained indicating that the scheme had spread to Wisconsin. On March 6 several mail collection boxes were broken into in Racine, Wisconsin. The individuals whose mail was stolen appeared as payees on several commercial checks cashed in the Racine area. Bank employees identified three women, Rose Covert, Lydia Brown, and Patricia Jackson, as the persons who cashed the checks. Also, Covert was seen driving a blue Firebird, the same car which she was driving at the time of her arrest in February 1979.

In April, forged commercial checks were passed in Milwaukee. Covert, Brown, and another female were identified as the women who cashed the checks. A large number of the checks passed in Wisconsin listed Bold King Enterprises as the drawer, a company which had been dissolved for several months.

In March of 1979, a teletype was sent to postal inspectors in the Upper Midwest area which described the scheme and the individuals suspected of being involved. Specifically, the postal inspectors knew that women generally were used to cash the checks and that male participants usually were parked nearby. The presence of male lookouts was known from information provided by various bank employees who had witnessed the operation of the scheme as well as from information supplied by the informant McMillan. Also, it was known that if inquiries were made at the bank about the check, the woman would not cash it but rather would deposit the entire sum in the account. Finally, the postal inspectors knew that many of the checks had been drawn on the account of Bold King Enterprises.

Postal Inspector Timothy Clifford of Madison, Wisconsin received this teletype describing the scheme and the individuals involved. On Monday, April 23, 1979 four break-ins of collection boxes were reported to Clifford.[4] These break-ins occurred on the west side of Madison. Clifford recognized this as part of the scheme which had been described in the teletype he had received in March. Clifford notified local banks to be alerted to checks drawn on the account of Bold King Enterprises and also showed bank officials pictures of the females suspected of passing the checks.

On April 25, Clifford received a call from the Randall State Bank, located on Madison's west side. Clifford was told that someone had attempted to pass a check which had Bold King Enterprises as the drawer. Thereafter, Clifford went to the Randall State Bank and questioned the teller who had received the Bold King Enterprises check. The teller described the woman who attempted to cash the check and also stated that when the teller stalled her, the woman became nervous and asked that the entire amount be deposited.

While showing photographs to the teller, another teller recognized the picture of Rose Covert which was included in the photograph spread. This second teller told Clifford that she had just received a check from Covert. Clifford looked through the checks cashed by the second teller and found a check drawn on Tod's Drum Service for $468.44, payable to Claire Thomas. Claire Thomas was also listed as the payee on the check presented to the first teller.[5]

Clifford left Randall State Bank and drove to the First Wisconsin Bank in the Hilldale shopping center. Clifford testified that he drove to Hilldale because it was located on the west side of Madison, near the collection boxes which had been broken into. Also, Clifford knew that the bank in Hilldale was open to later hours. When Clifford arrived at Hilldale, he saw a blue Firebird and a Ford parked in the area

---

4. Clifford testified that there had been no such break-ins in the Madison area for over two years.

5. The amount of the first check was $468.29.

adjacent to the bank parking lot. Both cars had Illinois license plates. As he drove past the cars, Clifford recognized Gaston in the Ford and also saw two females in the blue Firebird who were talking to a black male. Clifford noticed that one of the females matched the description given by the first teller he spoke to at the Randall State Bank.

Clifford went into the bank and spoke to a bank official. As he left the bank he recognized Rose Covert walking from the blue Firebird to the bank. Clifford parked away from the two cars and thereafter observed Covert hurrying from the bank into the car. Clifford then drove over to the cars and signalled for Covert to pull over—which she did. The men in the Ford, however, attempted to avoid Clifford. Clifford pulled his gun and one of the men got out of the Ford. The other man, defendant Gaston, remained in the car and began to burn some documents. However, a bank official who aided Clifford prevented the destruction of the materials. The documents recovered consisted of checks drawn on Bold King Enterprises, Tod's Drum Service, and other Chicago businesses as well as stolen mail. The checks were drawn payable to individuals in the Madison area whose mail had been stolen from mail collection boxes.

Gaston sought to suppress this evidence claiming that it was incident to an arrest without probable cause. His motion to suppress was denied by the magistrate. The district court also denied the motion to suppress.

## II

■ In determining whether a warrantless arrest was proper, a court must determine if the arresting officer had probable cause to arrest the individual. This depends upon the officer's own knowledge and the knowledge received from others which is reasonably trustworthy. There must be enough evidence to lead a reasonable prudent person to believe that the individual had committed or was committing a criminal act. *United States ex rel. Bur-*

*bank v. Warden, Illinois State Penitentiary,* 535 F.2d 361 (7th Cir. 1976), *cert. denied,* 429 U.S. 1045, 97 S.Ct. 750, 50 L.Ed.2d 758 (1977). This assessment must be made in light of the particular facts of each case. *Id.*

In the present case, Inspector Clifford, by the time of the arrest, had personal knowledge as well as information contained in the teletype sent to him in March. He knew the method by which the checks were obtained and cashed as well as the amounts of the checks and frequently used drawers. Also, prior to his trip to the Randall State Bank, he had an idea as to the participants in the scheme. He knew that women would present the checks while males waited outside.

Clifford's discussion with the bank tellers at the Randall State Bank led him to conclude that the scheme was being used in Madison. One check was drawn on Bold King Enterprises and the women identified by the tellers were individuals previously believed to be involved in the scheme. Clifford then decided to go to the Hilldale branch of the First Wisconsin Bank, believing it to be a possible target. When Clifford arrived, he recognized the blue Firebird. Also, he recognized Rose Covert and noticed that the other woman met the description given by the Randall State Bank teller. At that point, there could be little doubt that Clifford reasonably believed these women had attempted to pass the checks at the Randall State Bank. Clifford also recognized Gaston as one of the males in the Ford.

What is required is some nexus between the criminal activity engaged in by the women and the presence of the male members. Clifford knew that the male participants acted as lookouts and at that time could infer that the scheme was in operation. However, we need not rely entirely upon Gaston's presence to find a nexus between his activities and that of the women.

We believe that the conclusion that Gaston was involved in the scheme—as reflected in the reference to Gaston in the March teletype and known to Clifford—is

supported by other facts. There was evidence that Gaston had access to checks which previously had been used in the scheme. While there was no evidence that Gaston in fact took the checks belonging to Cecelia Galloway, his access does demonstrate a nexus between the scheme and Gaston. Likewise, we believe that Gaston's presence at Inspector Wachuta's interview with Jackson, as well as Covert's contacting Gaston for bail in February, provide a nexus between the female participants in the scheme and Gaston's involvement. Finally, we note the information supplied by McMillan about Gaston stealing mail from collection boxes. While we do believe that the tip taken alone may be insufficient, in light of other factors in the case, we believe the tip provided another tie between Gaston and the scheme.

Gaston proffers two arguments in urging us to conclude that there was no probable cause to arrest him. First, Gaston proceeds to discuss the connecting factors in a seriatim fashion and points out that each of the factors—access to Galloway's checks, presence at the Jackson interview, contacting of Gaston by Covert for bail, McMillan's information—standing alone amounts to no more than mere suspicion. Gaston's attempt to isolate each factor and discuss its significance in a factual vacuum misapprehends the probable cause analysis. The combination of all the above factors, plus Gaston's presence at the crime exactly as Clifford understood what the role of the male lookouts to be, presents a far different case than the mere existence of one of the factors. Thus, we reject Gaston's effort to discuss the significance of each factor in an isolated manner.

Gaston also contends that the mere presence of an individual in the company of one properly suspected of criminal activity does not necessarily give the police probable cause to arrest the other individual. In making this contention Gaston primarily relies upon *United States v. DiRe*, 332 U.S.

581, 68 S.Ct. 222, 92 L.Ed. 210 (1948) and *United States v. Chadwick*, 393 F.Supp. 763 (D.Mass.1975), aff'd, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

[4] We agree with Gaston's general statement that mere presence at the scene of a criminal offense does not give probable cause to arrest. Likewise, we believe that the reasoning of both *DiRe* and *Chadwick* support this proposition. However, the facts of the present case go beyond the mere presence of Gaston at the scene of the crime. Rather, as we note above, there was evidence to tie Gaston to the check cashing scheme beyond his mere presence at the Hilldale shopping center. Thus, we are not presented with the arrest of an individual where the arresting officer had no independent information of the individual's possible criminal conduct aside from his association with suspected criminals.

The presence of these other factors which tied Gaston to the scheme distinguishes this case from both *DiRe* and *Chadwick*. In *DiRe* the defendant was present at the sale of counterfeit gas rationing coupons between an informant and another individual. In holding that the arrest was illegal, the Court noted that the arresting officer had no information from the informant that DiRe was involved in the scheme. *Chadwick* involved a similar analysis. The defendant in *Chadwick* met two alleged drug dealers at the train station. While the police had been tipped off about the two dealers, they had no information as to the possible involvement of a third party. Concluding that a non-criminal explanation for the defendant's behavior was as likely as a criminal explanation, the court held that the arrest was without probable cause.[6]

■ Thus, unlike *DiRe* and *Chadwick* there was sufficient corroborating evidence besides mere presence to constitute probable cause to arrest. We therefore hold that the warrantless arrest was not in violation of the Fourth Amendment and that the search incident to that arrest was valid.

---

**6.** We also note that in *DiRe* and *Chadwick* the police had no information on the involvement of the defendant in the criminal activity. In the present case, Clifford was aware that male members played a role in the scheme.

The judgment of the district court is affirmed.