677 F.2d 602
 UNITED STATES of America, Plaintiff-Appellee,
v.
Edward FLEMING and Joseph Rolenc, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
$10,000 IN U. S. CURRENCY and One 1980 Cadillac, Defendants,
Joseph Rolenc, Claimant-Appellant.
 Nos. 81-2002, 81-2003, 81-2626 and 81-2627.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 21, 1982.
Decided May 10, 1982.
Rehearings Denied June 7, 1982.
 
 Elliott Samuels, Gerald M. Werksman, Chicago, Ill., for defendants-appellants.
 Thomas P. Walsh, John L. Sullivan, Frederick H. Branding, Chief, Civ. Div., Asst. U. S. Attys., Dan K. Webb, U. S. Atty., Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS, Chief Judge, SWYGERT, Senior Circuit Judge, and POSNER, Circuit Judge.
 CUMMINGS, Chief Judge.
 
 
 1
 Edward Fleming and Joseph Rolenc were tried jointly on federal drug charges. After a bench trial in which most of the evidence introduced was stipulated testimony from an earlier suppression hearing, Fleming was convicted of possession of 227 grams of a mixture containing cocaine, 21 U.S.C. § 841(a)(1); and Rolenc was convicted of attempted possession of the same mixture with intent to distribute, 21 U.S.C. § 846. Fleming was sentenced to five years' probation on condition that he serve six months in a work-release program. Rolenc was sentenced to three years' probation, conditioned on four months' service in a work-release program.
 
 
 2
 Following the criminal convictions, the government instituted civil forfeiture proceedings against property seized from Rolenc when he was arrested for the drug offense: $10,000 in cash (forfeitable under 21 U.S.C. § 881(a)(6)) and Rolenc's 1980 Cadillac (covered by § 881(a)(4)). By agreement the case was tried on the record generated in the criminal suit, and Judge Shadur found in favor of the government on both forfeiture claims.
 
 
 3
 These consolidated appeals raise the following issues which we deal with seriatim:
 
 
 4
 (1) Did the law enforcement officers have probable cause to make warrantless arrests of Edward Fleming and Joseph Rolenc on August 8, 1980?
 
 
 5
 (2) Should the contents of paper bags seized from both defendants-one containing $10,000, the other containing the cocaine mixture-have been suppressed because the officers opened them without first obtaining a search warrant?
 
 
 6
 (3) Was the warrantless entry into Fleming's home and the subsequent seizure of cocaine therein a violation of Fleming's Fourth Amendment rights?(4) Was the evidence sufficient to prove that Rolenc attempted to possess cocaine for further distribution?
 
 
 7
 (5) Did the government meet its (minimal) burden of proof in the forfeiture cases?
 
 I. Factual Background
 
 8
 Edward Fleming lived at 2122 N. Kenmore Avenue in Chicago; he also used his home as headquarters for an art reproduction and antique business. In April of 1980 the Chicago police department and the Drug Enforcement Administration began an elaborate surveillance of Fleming and his acquaintances. Law enforcement officers obtained Fleming's long-distance telephone records, installed pen registers on his three telephones, and posted men to watch the comings and goings at Fleming's house. Some of the information gathered in this investigation has no relevance to the existence vel non of probable cause to arrest Rolenc and Fleming on August 8, 1980.[1] But other information-facts relayed to police officer Bobko and observations made by him during the continuous seventy-day period he spent watching Fleming's house-is highly relevant. Bobko made the arrests on August 8, and Fleming and Rolenc argue that because Bobko's suspicions at that time do not rise to the level of probable cause, the arrests and their consequences were tainted.
 
 
 9
 What did Bobko in fact know? He had information that made it very likely that Fleming dealt in cocaine. In particular, Bobko had seen Joe Pepitone visit Fleming's residence for fifteen minutes on the night of June 25, 1980; and he knew that Pepitone had been arrested two and a half hours later, in the same car he had driven to Fleming's house, for possession of cocaine. Bobko knew that Fleming had come out of his residence on June 30, 1980, met Jay Emerich at a nearby corner, and given Emerich a small bag. Reliable informants had told Bobko's superior officer that Emerich was a known user and dealer of cocaine, and the information had been relayed to Bobko. Finally Bobko knew that an undercover DEA agent had succeeded in buying cocaine on July 22, 1980, from William Leverance. Leverance had set up the transaction for 9:30 p. m., saying that he had to pick up the cocaine from a source "up north";[2] at 8:45 Bobko saw Leverance come to Fleming's house, give Fleming a small plastic bag, and wait ten minutes for Fleming to return it to him.[3]
 
 
 10
 Bobko also knew, based on his extensive observations of Fleming's house and environs, that the house was probably Fleming's base of operations. The people who came and went during Bobko's prolonged surveillance fell into three categories: (a) workmen engaged in the remodeling Fleming was having done; (b) customers of Fleming's art business, who approached the house briskly, spent a short time inside, and emerged with packages in new cardboard boxes; and (c) people who parked far from the residence, seemed to reconnoiter carefully before approaching, and on leaving tried to conceal small packages, not at all similar to the cardboard parcels of the art customers.
 
 
 11
 Bobko knew much less about Joseph Rolenc. He had seen him at Fleming's twice and knew that Rolenc worked in the Cook County Sheriff's office. The other investigators knew only slightly more than Bobko: Fleming had called Rolenc twice (on June 5 and August 7, 1980); Rolenc was a bailiff in the Sheriff's Department; and he had been placed under surveillance (we do not know with what results) in early August. One officer testified that Rolenc drove very fast to Fleming's house on August 8, but Rolenc's haste was not apparent to Bobko.[4]
 
 
 12
 Coming to the events immediately surrounding the arrests, Bobko saw Rolenc drive south on Kenmore on the afternoon of August 8, park his car, and get out carrying a brown paper bag folded into a rectangular parcel and secured with rubber bands. Rolenc walked to Fleming's front porch, while Bobko watched from the sidewalk. From his vantage point Bobko saw Fleming inside the house spread the venetian blinds and look out at Rolenc. Bobko was not sure whether the door opened before or after Rolenc rang the doorbell,[5] but once the door was ajar Bobko saw Fleming with a small paper bag in his hand. Bobko had raced up the steps behind Rolenc, and at that moment he grabbed Rolenc and arrested him. He also put his foot in the doorway to prevent Fleming from shutting the door. Two other officers who had been assigned to the stake-out went in through the door and arrested Fleming.[6]
 
 
 13
 In the scuffle Rolenc's bag was knocked from his hand. Officer Bobko picked it up immediately, but opened it only after Rolenc had been taken to the street and handcuffed. The bag contained $10,000. Fleming's bag had also fallen to the floor just inside the doorway; and as one of the officers went in to make the arrest he picked up the bag, opened it, and saw what he thought was cocaine. A field test done by a colleague confirmed his guess.[7]
 
 II. The Criminal Prosecution
 
 14
 A. Probable Cause to Arrest Fleming and Rolenc
 
 
 15
 The district court correctly relied on three factors to find that Bobko had probable cause to arrest Fleming and Rolenc: (1) Bobko's knowledge of Fleming's earlier cocaine transactions-both the specific incidents involving Pepitone, Emerich, and Leverance, and the pattern observed when people came to Fleming's house; (2) Bobko's observation that Rolenc and Fleming were each carrying paper bags, not of the type associated with Fleming's art business; and (3) the indications Bobko had that Rolenc's arrival was anticipated by Fleming. These factors are especially telling as to Fleming, but this is not a case of Rolenc being tarred with Fleming's brush. Ybarra v. Illinois, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 and Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, are not apposite. The small rectangular object Rolenc was carrying, the speed with which he was met at the door, and Fleming's appearance also with a small bag all suggested to Bobko that a drug transaction-necessarily involving a buyer and a seller-was about to take place. Fleming and Rolenc try to suggest that Bobko was relying on a drug courier profile as did the agents in Reid v. Georgia, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (Br. 35, 50), but that is inconsistent with the extent and particularity of Bobko's personal observations. They also argue that Rolenc might have been simply an art customer (Br. 35-36). Probable cause does not, however, require that every inference in the chain be susceptible only of nefarious explanations. It is sufficient if Bobko had "enough evidence to lead a reasonably prudent person to believe that (Fleming and Rolenc) had committed or (were) committing a criminal act." United States v. Gaston, 620 F.2d 635, 638 (7th Cir. 1980). The Gaston standard is satisfied in this case.
 
 
 16
 B. The Searches of Rolenc's and Fleming's Paper Bags
 
 
 17
 In the excitement of the arrests, both Rolenc and Fleming dropped the paper bags they had been carrying. Bobko picked up Rolenc's bag and another officer picked up Fleming's. Fleming's bag was opened in his presence and immediately; Rolenc's bag was not opened for about five minutes, until after Rolenc had been disarmed, taken to the street, and handcuffed. Bobko and Rolenc were standing together when Rolenc's bag was opened.
 
 
 18
 Rolenc and Fleming argue that even if their arrests were valid and the police could seize the paper bags, "the searches of (the) closed paper bags, after they had been recovered from the defendants and were securely in police custody, were illegal in the absence of a warrant, consent, or exigent circumstances" (Br. 38). The (unstated) major premise of this argument is valid: a search incident to arrest can be undertaken without a warrant to prevent an arrested person from seizing a weapon or destroying evidence within his "grabbing area," but the availability and scope of such a search cannot be expanded beyond the reasons for allowing it. Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685. The minor premise is less clear: once Rolenc was handcuffed, and once additional officers were entering Fleming's house to secure the premises, was each of the paper bags within the officers' custody and outside the grabbing area of either Fleming or Rolenc? The defendants-appellants think the answer is a self-evident yes, and they urge us to hold that because the danger addressed by a Chimel search had dissipated, so had any justification for opening the bags without a search warrant.
 
 
 19
 Precedent of the Supreme Court and this Circuit suggests that the right to conduct a Chimel search is not so evanescent. Rolenc and Fleming rely on United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, but Chadwick is easily distinguishable. There the search of a 200-pound footlocker, more than an hour after it had been taken from a car's trunk and also after defendants had been locked in jail cells, was too remote in time and space from the initial arrest to qualify as a Chimel search.[8] United States v. Garcia, 605 F.2d 349 (7th Cir. 1979), certiorari denied, 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841, on which the government relies,[9] is more to the point. There this Court upheld, on Chimel grounds, the virtually immediate search of two hand-carried suitcases that the suspect had dropped on being arrested. At the time of the search, one officer had the distraught suspect in hand (though not handcuffed), and the other had the suitcases in his possession. On these facts, the luggage could not yet be said to be in the "exclusive control" of the authorities, so as to render a Chimel search unreasonable. Id. at 355-356. While neither Chadwick nor Garcia is by itself dispositive, the facts in this appeal are surely closer to Garcia than to Chadwick.
 
 
 20
 Additional guidance is furnished by Belton v. New York, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In an opinion by Justice Stewart, the author of Chimel, the Supreme Court established a per se rule: when the occupant of an automobile is arrested, the entire passenger compartment of the car constitutes his "grabbing area" and can be searched as an incident of the arrest. Id. at 460, 101 S.Ct. at 2864. Although it is clear that Belton's per se rule is not transferrable to all Chimel searches,[10] it is noteworthy that the New York Court of Appeals, whose decision Belton reversed,[11] had accepted precisely the argument Fleming and Rolenc advocate here-that the occupants of the car, having been removed some distance from it, had no realistic chance to grab anything and therefore the need for a Chimel search no longer existed. The Belton Court instead emphasized that "(t)he scope of (a) search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible,"[12] and that "(t)he authority to search the person incident to a lawful custodial arrest * * * does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of a suspect."[13]
 
 
 21
 A fair inference from this language is that a reviewing court, charged with the task of evaluating a Chimel search, must first put itself in the position of the law enforcement officers who initiated it. Here then we must decide whether, when Bobko and his colleague first picked them up, the bags were within Fleming's and Rolenc's grabbing area. They clearly were. Only after we have engaged in the same ex ante calculations that the police themselves faced should we consider whether subsequent events made a Chimel search unreasonable.[14] At this second level of inquiry it does not make sense to prescribe a constitutional test that is entirely at odds with safe and sensible police procedures.[15] Thus handcuffing Rolenc and having reinforcements enter Fleming's house should not be determinative, unless we intend to use the Fourth Amendment to impose on police a requirement that the search be absolutely contemporaneous with the arrest, no matter what the peril to themselves or to bystanders. It is surely possible for a Chimel search to be undertaken too long after the arrest and too far from the arrestee's person. That is the lesson of Chadwick. But we do not consider that the presence of more officers than suspects invalidated the immediate search of Fleming's bag. Nor do we think that a five-minute delay between seizing Rolenc's bag and opening it, occasioned by Bobko's handcuffing Rolenc and moving with him to the street, defeased Bobko's right to search under Chimel principles.
 
 
 22
 The conclusion that Rolenc's and Fleming's bags were properly searched as incidents of their arrests eliminates any need to consider the fall-back position of the defendants (and the government)-that Fleming and Rolenc did (or did not) have an expectation of privacy in their paper bags.[16] A valid search incident to arrest has as a corollary that any container "may, of course, be searched, whether it is open or closed, since the justification for the search is not that the arrestee has no privacy in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." Belton, supra, at 461, 101 S.Ct. at 2864.
 
 C. The Warrantless Entry of Fleming's House
 
 23
 Fleming had new counsel after the district court denied his motion to suppress based on the contentions in Parts A and B supra, and the second attorney renewed the motion to suppress on a completely different theory. The police, so the argument went, did not have flimsy evidence of Fleming's possible involvement in drug trafficking. Rather, they had so much evidence that they should have obtained an arrest warrant for him and a search warrant for his house before August 8, 1980. Their failure to do so, Fleming argued, negated any exigency that might otherwise take the arrest and seizure of the cocaine out of the rule of Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639.[17] Judge Shadur's rejection of this alternate theory is another ground of appeal (Br. 42-45).
 
 
 24
 Payton is, as Judge Shadur recognized,[18] a red herring. The officers here did not make a routine felony arrest of Fleming, without a warrant, in his home. They followed him into his home after they saw him standing with his front door ajar, engaging in what they reasonably believed to be a drug sale. They followed him into the house only after he attempted to shut the door and flee. The police conduct is governed, not by Payton, but by United States v. Santana, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300, which Fleming neither cites nor distinguishes. In Santana the drug sale had been completed and the seller was standing in the doorway of her house, paper bag in hand, when the police announced themselves and moved to arrest her. She retreated inside. The Supreme Court held that Mrs. Santana was in a public place when the police sought to arrest her, and that "a suspect may not defeat an arrest which has been set in motion in a public place * * * by the expedient of escaping to a private place." 427 U.S. at 43, 96 S.Ct. at 2409.
 
 
 25
 Absent any constitutional defect in what the authorities did, we have no reason to second-guess their investigative strategy. It is uniquely within their competence to decide whether it will make a stronger case for the prosecutors to seek warrants for the arrest of Fleming and the search of his house, or to continue their stakeout in the hopes of catching Fleming and one of his customers redhanded. As the district judge observed, "It was certainly permissible for officers to elect to go for bigger-and what they hoped would be surer-game."[19]
 
 
 26
 D. The Sufficiency of the Evidence to Convict Rolenc
 
 
 27
 Rolenc challenges his conviction on two grounds: that the evidence failed to prove his criminal intent, and that his conduct had not crossed the line between preparation, which is too inchoate to be punished, and attempt, which is not.
 
 
 28
 Our review has two fundamental limitations that Rolenc seems to ignore. The first is that we must affirm unless the evidence, viewed in the light most favorable to the verdict, could not have persuaded any rational trier of fact of Rolenc's guilt beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680. Second, as seen in Part II, both the cocaine and the cash were properly admitted into evidence. Thus speculations about whether Rolenc could have been convicted if he had been carrying "six pinochle decks, greeting cards, or three watches" or if Fleming had been carrying "dog food, pornographic films, stolen diamonds, dirty laundry, costume jewelry, a revolver, a hamburger from McDonalds, (or) his false teeth" (Br. 56-57) are both counterfactual and superfluous. Fleming was in fact carrying 227 grams of 41% pure cocaine, and Rolenc was in fact carrying $10,000. Thus more than "mere proximity to the drug" (Br. 57) was made out. There was also evidence, which Judge Shadur credited, that Fleming and Rolenc did not meet by happenstance.[20] Rolenc's criminal intent to possess and, in view of the quantity of cocaine involved, to distribute was sufficiently demonstrated. As to attempt liability, there is every reason to think that, but for the intervention of Bobko, the transaction would have been consummated. It is hard to imagine any more substantial step Rolenc could have taken to obtain drugs than putting himself on Fleming's doorstep with $10,000 in cash in his hand. Accordingly, Rolenc's conviction is affirmed.
 
 III. The Forfeiture Actions
 
 29
 In large measure Rolenc's challenge to the forfeiture proceedings is disposed of by our decisions in Part II supra. The property was not seized pursuant to an invalid warrantless arrest (Part II A supra; Rolenc Forfeiture Br. 7); nor did the trial court convict Rolenc on insufficient evidence (Part II D supra; Rolenc Forfeiture Br. 8). All that remains is Rolenc's obviously uphill argument that the evidence, though sufficient to convict him of a drug offense, was not adequate to show that he used either the currency or the Cadillac to commit the crime.
 
 
 30
 As Judge Shadur's forfeiture order demonstrates,[21] this last basis for challenge ignores the essential attributes of a forfeiture proceeding. Rolenc's success or failure depended critically on where the burden of proof lay. The government's burden was only to show probable cause for the forfeiture proceedings, and it surely did so. The burden then shifted to Rolenc as claimant to show by a preponderance of the evidence that the property was not subject to forfeiture. United States v. One 1976 Mercedes Benz 280S, 618 F.2d 453, 456 (7th Cir. 1980); United States v. $22,287 in U. S. Currency, 520 F.Supp. 675, 677-678 (E.D.Mich.1981). Rolenc had to offer proof that the currency was not "furnished or intended to be furnished * * * in exchange for a controlled substance" (21 U.S.C. § 881(a)(6)) and that the Cadillac was not "used, or * * * intended for use, to transport, or in any manner facilitate the transportation, sale, receipt, possession, or concealment of (a controlled substance)" (21 U.S.C. § 881(a)(4)). The task is surely hopeless as to the currency. We think it is likewise doomed as to the Cadillac. Rolenc's arrival in the car at a location far from his south-side home, his participation in the drug transaction at Fleming's house, and the likelihood that he planned to leave as he had come met the government's burden. Rolenc offered nothing but speculation to meet his burden, and speculation must leave the burdened party the loser. Judge Shadur did afford Rolenc another safeguard: he carefully examined the statute and the case law to see if a narrowing construction could make its terms inapplicable as a matter of law.[22] He found no basis to grant Rolenc relief, and neither do we.
 
 
 31
 In Nos. 81-2002 and 2003, the convictions are affirmed. In Nos. 81-2626 and 2627, the forfeiture orders are also affirmed.
 
 
 
 [1]
 For example, Fleming made frequent calls to California and Florida, and some of his friends were associated with other suspected drug dealers. "None of this information, either singly or in the aggregate, provides any basis for a finding of probable cause on the day of the arrest" (Judge Shadur's denial of the motion to suppress, Opinion I, Fleming and Rolenc App. 2)
 
 
 [2]
 When Leverance set up the buy, he was in the area around Rush and Division Streets, south of Fleming's address (Opinion I, Fleming and Rolenc App. 4)
 
 
 [3]
 Fleming's version of these events is quite different. He says that Pepitone visited him to pay a bill for advertisements in sports programs, and that Emerich was picking up promotional t-shirts. He says nothing about Leverance. (Br. 8-12)
 
 
 [4]
 Fleming testified that he had known Rolenc for four or five years and that Rolenc had been an investor and partner in one of Fleming's home-based businesses (Br. 8). Rolenc testified that he packaged, wrapped, and mailed out orders for Fleming (Br. 7). The defense suggests that Rolenc was there as a potential customer (Br. 35, 36)
 
 
 [5]
 At the suppression hearing Bobko testified that Fleming opened the door before Rolenc could ring the bell. In the complaint Bobko had said that Rolenc rang the doorbell first. Given the testimony that Bobko saw Fleming peer through the venetian blinds, the confusion about when the doorbell rang is relatively unimportant. Judge Shadur explicitly so found (Opinion I, Fleming and Rolenc App. 5, n. 3)
 
 
 [6]
 Again Fleming's version of the events is substantially different. He says he was carrying nothing when he came to the door, and the police pushed past him, over his protests, explaining only that they needed to "secure the premises" (Br. 8-9)
 
 
 [7]
 A subsequent search and the discovery of more cocaine in Fleming's living quarters are not challenged in this appeal
 
 
 [8]
 Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235, on which Fleming and Rolenc also rely, is not in point. The Court held that luggage found in the trunk of a taxi could not be searched without a warrant, though there was no delay as in Chadwick, because the automobile exception was not applicable. Once the officers had the luggage, its provenance was irrelevant. Search incident to arrest was not at issue in Sanders, because no arrests had occurred when the taxi driver consented to the search and because the trunk would not have been in the "grabbing area" of the taxi's passengers in any case. See Belton v. New York, 453 U.S. ----, ----, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981)
 
 
 [9]
 The government also cites United States v. Graham, 638 F.2d 1111 (7th Cir. 1981), certiorari denied, 450 U.S. 1034, 101 S.Ct. 1748, 68 L.Ed.2d 231. Although it discusses Garcia, supra, with approval, the actual issue resolved in Graham is that a search warrant for a person permits the search of a shoulder bag he is carrying
 
 
 [10]
 453 U.S. at 460, n.3, 101 S.Ct. at 2864, n.3: "Our holding today does no more than determine the meaning of Chimel 's principles in this particular and problematic conte(x)t. It in no way alters the fundamental principles established in the Chimel case regarding the basic scope of searches incident to lawful custodial arrests."
 
 
 [11]
 50 N.Y.2d 447, 429 N.Y.S.2d 574, 407 N.E.2d 420 (1980)
 
 
 [12]
 453 U.S. at 457, 101 S.Ct. at 2862, quoting Chimel, supra, 395 U.S. at 762, 89 S.Ct. at 2039, which in turn quotes Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889. Emphasis is added
 
 
 [13]
 Id. 453 U.S. at 461, 101 S.Ct. at 2864, quoting United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427. Emphasis is added
 
 
 [14]
 This stage of the inquiry is rendered unnecessary, in cases where the arrestees are occupants of a car, by Belton's rule. As note 10 supra indicates, it is still necessary in other Chimel searches
 
 
 [15]
 Cf. Garcia, supra, 605 F.2d at 355: "Under (a construction that equates taking property from the arrestee with the 'exclusive control' of Chadwick ), for example, the warrantless search of an arrestee resulting in the seizure of a wallet, purse, or shoulder bag would prohibit an immediate search of the contents of that type of container, and this is plainly contrary to the law governing searches incident to arrest." (Footnote omitted.)
 
 
 [16]
 That is a vexed question. In Robbins v. California, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), a plurality of the Court recognized that the privacy interest does not depend on the nature of the container. United States v. Ross, 655 F.2d 1159 (D.C.Cir.1981), certiorari granted, --- U.S. ----, 102 S.Ct. 386, 70 L.Ed.2d 205 (1981), found a protectible privacy interest in a paper bag. The Supreme Court granted certiorari to consider whether Ross should be reversed and Robbins overruled. A summary of the oral argument can be found at 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1982)
 
 
 [17]
 "We * * * hold that the Fourth Amendment * * * prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1375. "(W)e have no occasion to consider the sort of emergency or dangerous situation, described in our cases as 'exigent circumstances,' that would justify a warrantless entry into a home for the purpose of either arrest or search." Id. at 583, 100 S.Ct. at 1378
 
 
 [18]
 Denial of renewed motion to suppress (Opinion II, Fleming and Rolenc App. 14, n. 3)
 
 
 [19]
 Opinion II, Fleming and Rolenc App. 14, n. 2
 
 
 [20]
 Findings of the Court Pursuant to Fed.R.Cr.P. 23(c) (Opinion III, Fleming and Rolenc App. 19). Cf. Opinion I, Fleming and Rolenc App. 5, n. 3: "Although the statements differ (about the doorbell), this Court finds that difference insufficient to cast material doubt on the testimony of Bobko (who was a highly credible witness) and finds that in any event Rolenc' arrival was plainly anticipated."
 
 
 [21]
 Memorandum Opinion and Order on Forfeiture Claims, now published at 521 F.Supp. 1253, 1255 (N.D.Ill.1981)
 
 
 [22]
 Id. at 1255-1257