**UNITED STATES**

**v.**

**Adam MIDED.**

**No. 83 CR 764.**

United States District Court, N.D. Illinois, E.D.

March 15, 1984.

---

**19.** See footnote 8, supra

Dan K. Webb, U.S. Atty., John L. Sullivan, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Maren J. Dougherty, Levenfeld, Eisenberg, Janger, Glassberg, Genson & Lippitz, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Adam Mided ("Mided") has been indicted[1] on charges of:

1.  conspiracy to distribute cocaine (Count One); and

2.  possession with intent to distribute approximately 1,045 grams of a mixture containing cocaine (Count Four).

At the time of Mided's arrest, law enforcement officials seized from him, and then searched, two packages containing cocaine. Promptly thereafter they seized and conducted an inventory search of Mided's jeep, seizing a scale found behind the seat.

Mided moves to suppress the use in evidence of the contents of both the packages and the jeep, claiming both his arrest and the concomitant seizures and searches were unlawful. On the record developed at the pretrial suppression hearing, this Court denies Mided's motion.

*Facts* [2]

During August and September 1983 DEA Agent Ron Tomcik ("Tomcik") had several cocaine transactions with Blake Kiefer. Blake said his source of supply was his uncle, Ross Kiefer ("Kiefer").

On September 6 Tomcik and two other agents met Kiefer at the O'Hare Hyatt to buy drugs from him. Kiefer told the agents they would have to front the money and he would then to go his source. Kiefer then made a phone call to a number the agents later traced to Ron Zilberbrand ("Zilberbrand"). Kiefer was followed to the Marriott Hotel, where he met Zilberbrand. Both men then got into Zilberbrand's car and went to his residence. After about five minutes Kiefer got out of the car, carrying a brown manila envelope, took a cab back to the Hyatt and delivered four ounces of cocaine to the agents.

On September 18 Tomcik, again at the Hyatt with several other agents, called Kiefer at his home to arrange another transaction. At about 5 p.m. Kiefer came to the agents' room at the Hyatt. At 6 p.m. he went down to the lobby to phone his source. About ten minutes later agents positioned at Zilberbrand's residence saw Zilberbrand and Mided leave the residence, get into Mided's jeep and drive to 1400 North Lake Shore Drive (the "1400 Building").

When Kiefer returned to the agents' room at the Hyatt he said "his people" would call. At about 6:30 p.m. the call came in. Tomcik heard Kiefer use the name "Ronnie" over the telephone. Kiefer

---

1.  Mided is one of six defendants charged in this indictment.

2.  Only one witness testified at the suppression hearing: Chicago Police Officer John Griffin ("Griffin"), who had worked for some 2½ years as a member of the Drug Enforcement Administration ("DEA") Task Force in the Chicago area.

After the hearing the government moved without objection to reopen the record to tender as exhibits (1) the DEA manual provisions requiring the inventorying of the contents of seized vehicles and (2) DEA's form used for that purpose. Accordingly the facts stated in this section are uncontroverted.

and the agents then took a cab to the Drake Hotel, arriving at 7:15 p.m., and stood on a street corner.

Meanwhile Zilberbrand and Mided had left the 1400 Building and had arrived at the Blackstone Hotel. One of the agents followed them up to a room. Just a few minutes later both men left the Blackstone carrying a blue and silver plastic bag, got into the jeep and drove to the Drake, stopping about a half block away. Zilberbrand left the jeep without the bag, and Mided drove on to the 1400 Building and entered the building carrying the bag.

Zilberbrand met Kiefer and the agents on the street corner and told them they had to walk a little while to get to the place where the transaction was to take place. Zilberbrand led the group to the 1400 Building. When they entered the lobby the agents arrested Kiefer and Zilberbrand, who then said "Adam Mided" had the drugs and was on the 15th floor, where Zilberbrand had an apartment. Several agents went up to that floor. Mided emerged from Zilberbrand's apartment and walked toward the agents. Though Agent Griffin did not know his identity (Kiefer and Zilberbrand not having given a description of Mided, but only his name), he called out "Adam." Mided dropped the bag and was immediately arrested.

Agent Griffin then picked up the bag and looked into it, seeing two packages completely wrapped in duct tape. Agent Griffin has seen duct-tape-wrapped packages on 10 to 15 occasions, and without exception they have contained some kind of narcotics. One or two other people came out of their apartments, so the agents took Mided into Zilberbrand's apartment and told Mided to sit in a chair. One of the agents opened the package and field tested the contents, which tested positive for cocaine.

After the field test Mided, upon request by the agents, relinquished his keys to the jeep. Griffin told another agent to take the jeep under the "seizure statute", 21 U.S.C. § 881 ("Section 881"). Later at the DEA garage, agents conducted an invento-ry search of the jeep, finding a scale in the rear area.

*Probable Cause To Arrest*

Mided argues the agents did not have probable cause to arrest him, but arrested him only because of his association with Zilberbrand, the suspected source of the drugs. Probable cause simply means:

enough evidence to lead a reasonable prudent person to believe that the individual had committed or was committing a criminal act.

*United States v. Gaston*, 620 F.2d 635, 638 (7th Cir.1980) (per curiam); see *United States v. Fleming*, 677 F.2d 602, 606 (7th Cir.1982). Of course mere association with a person suspected of criminal activity is not enough to establish probable cause to arrest the non-suspected individual, see *United States v. Everroad*, 704 F.2d 403, 407 (8th Cir.1983). But when that association is coupled with independent evidence connecting the person with criminal activity, the probable cause threshold is passed. *Gaston*, 620 F.2d at 639.

Here the agents did have Mided's association plus independent information to connect him to the criminal activity:

1. Agents knew Zilberbrand was the source of the drugs.

2. Agents watched Mided participate in bringing the bag to the location later specified for the transaction.

3. Zilberbrand upon his arrest said Mided had the drugs.

4. Mided responded to his first name being called in the hallway as he left Zilberbrand's apartment, carrying the blue and silver bag.

Contrary to Mided's implicit assertion, the agents did not have to *know* the bag contained cocaine. All the agents had to possess was a reasonable belief Mided was involved in criminal activity.

Thus at the time of Mided's arrest (1) Zilberbrand was the known source, (2) Kiefer had arranged a transaction with Zilberbrand, (3) Mided had gone along with Zilberbrand to all the places specified in the

"Facts" section, including the place of the proposed transaction, and (4) Zilberbrand had specifically identified Mided at the time of his own arrest. Certainly a reasonably prudent person could then have believed Mided was involved in this drug transaction. That is all the agents needed to arrest him lawfully.

### Search Incident to Lawful Arrest

Mided next argues the agent's opening of the package for the field test was beyond the permissible scope of a search incident to an arrest under *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). Mided couples that argument with *United States v. Griffith*, 537 F.2d 900, 904 (7th Cir.1976) to urge that the agents placed the package near him as a pretext for allowing them to open the package.

Much could be said for a view of the Fourth Amendment under which an arrest on probable cause, followed by a seizure of suspected contraband in the arrestee's possession, would not itself justify a warrantless search of the seized property. After all, once that property is in the hands of an arresting officer and the suspect is in secure custody, arguably there is no need for a hasty examination rather than presentation of the search warrant issue to an impartial magistrate (see this Court's opinion in *Fleming*, No. 80 CR 712, slip op. at 9–11 (Feb. 20, 1981), *aff'd* by our Court of Appeals, 677 F.2d at 606–08). That would be a fair reading of the "exclusive control" concept articulated in *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977).

But the law of search and seizure has not developed in that fashion, and there may be a number of reasons it has not. For one thing, such a rule would complicate the analysis of variables: just how "secure" the custody was (where the suspect was not (say) handcuffed, the number of officers involved would be a factor); whether it was feasible to keep the suspect in custody and still go before the magistrate with the putative contraband (again that would

be a function of the numbers of officers, the logistics and physical location of the arrest and detention, and other factors— considerations that have clearly affected the automobile search cases), and so on. It may also be legitimate, in law enforcement terms, for courts to prefer something closer to a "bright line" rule in the interests of certainty. In any case, whatever the cause, in both our Court of Appeals and the Supreme Court the Fourth Amendment has been given a different reading.

■ Under that reading, once Mided was arrested the agents had the authority to seize and then search anything found within Mided's "grabbing area." *Fleming*, 677 F.2d at 606. Whatever search is made of the items so seized is considered incident to the arrest and must not be undertaken too long after the arrest. *Id.* at 607. Surely the bag was within Mided's "grabbing area." As for the second part of the inquiry, an agent seized the bag immediately and looked into it seeing the two packages. Just as in *Fleming*, the agent's search of the contents of the package within five minutes of its seizure was within the permissible time frame of a *Chimel* search. *Fleming*, 677 F.2d at 607–08.

■ Mided's pretext argument miscasts the reason the agents were allowed to search the contents of the package. Any package found within the arrestee's "grabbing area" can be searched whether it is opened or closed. *New York v. Belton*, 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). In other words, the agents needed no additional authority to open the package once it was seized out of Mided's "grabbing area," as long as that subsequent search was proximate in time to the arrest.

### Search of the Jeep

■ Mided lastly relies on the automobile-search principles announced in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) to argue his jeep should not have been searched. In that respect Mided asserts the agents did not

have probable cause to believe any contraband was contained in the jeep. In response the government contends Section 881(b) authorized seizure of the jeep, and once it was lawfully seized the agents were entitled to conduct an inventory search of its contents.

Section 881(b) authorizes seizure of a vehicle if the agents had probable cause to believe the vehicle had been used in transporting controlled substances. Clearly at the time the agents seized Mided's jeep, they had probable cause to believe Mided had transported cocaine in the jeep.

However, establishing probable cause for seizing the jeep only goes halfway in sustaining the agents' actions. Such seizure must also be reasonable under the Fourth Amendment. *United States v. Kemp*, 690 F.2d 397, 401 (4th Cir.1982). Two factors are significant in that regard under the cases:

1. Mided's jeep being parked in the public street, he could have no reasonable expectation of privacy that would prevent its seizure under the Fourth Amendment. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351–52, 97 S.Ct. 619, 627–28, 50 L.Ed.2d 530 (1977).

2. Mided also had a lesser expectation of privacy in the jeep as property subject to forfeiture. For that purpose the government had an interest in the jeep, which arose at the time the jeep was used in violation of the statute. *Kemp*, 690 F.2d at 401–02 n. 6; see *United States v. $84,000 U.S. Currency*, 717 F.2d 1090, 1101–02 (7th Cir.1983); see also *United States v. One 1978 Mercedes Benz*, 711 F.2d 1297, 1300–02 (5th Cir. 1983) (approving the *Kemp* analysis).

Thus it cannot be said a warrantless seizure of the jeep unduly impinged upon Mided's expectation of privacy in the jeep so as to violate his Fourth Amendment right against an unreasonable seizure.

█ Once lawfully seized, a vehicle is subject to an inventory search conducted

according to established procedures. Such a search is not unreasonable under the Fourth Amendment. *South Dakota v. Opperman*, 428 U.S. 364, 372–76, 96 S.Ct. 3092, 3098–3100, 49 L.Ed.2d 1000 (1976); *United States v. Griffin*, 729 F.2d 475 at 483–484 (7th Cir.1984);[3] see also *Illinois v. Lafayette*, ___ U.S. ___, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

Griffin's testimony and the government's exhibits establish the jeep was searched at the DEA garage according to established procedures. Accordingly, the scale found during the course of that search is admissible.

### Conclusion

Mided's motion to suppress is denied in its entirety.

---

**3.** As *Griffin, id.* at 481 n. 7 points out, the inventory search situation renders *Ross* inappli-

