**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles SEWELL, Defendant–Appellant.**

**No. 90–2312.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 14, 1990.

Decided Sept. 16, 1991.

Joshua T. Buchman, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, for plaintiff-appellee.

Standish E. Willis (argued), Chicago, Ill., for defendant-appellant.

Before BAUER, Chief Judge, and POSNER and KANNE, Circuit Judges.

BAUER, Chief Judge.

At approximately 10:00 p.m. on November 11, 1988, Chicago Police narcotics officers, acting on information provided by a confidential informant, conducted surveillance on the apartment of Charles Sewell, the second floor of a two-flat on Chicago's south side. Within ten minutes, the officers observed approximately fifteen people enter and leave the building—after spending no more than a few moments inside. The officers believed that this activity by several people in a short space of time indicated that narcotics were being sold inside the building.

Posing as a drug purchaser, one of the officers entered the building and knocked on the door to the second floor apartment. Sewell opened the door. While the officer stood in the hallway, and Sewell just inside the door, the officer asked Sewell for "a dime bag of wickie"—street vernacular for ten dollars worth of marijuana laced with phencyclidine ("PCP"). The officer handed Sewell ten dollars. Sewell turned and handed the money to a woman, later identified as Sewell's wife, who was seated at a table just inside the open door. Through the open doorway, the officer saw lying on the table crushed green plant, tin foil packets, some cash, and a large caliber handgun. The officer observed Sewell's wife as she placed the crushed green plant into tin foil packets.

When Sewell handed the ten dollars to his wife, she handed him a tin foil packet which he in turn handed to the officer through the open doorway. The officer tipped his hat to alert the back-up officers that an undercover drug purchase had been made, and then announced to Sewell that he was a police officer. As the officer pulled out his badge and gun, Sewell tried to close the apartment door. The officer prevented Sewell from closing the door, pursued him into the apartment, and arrested him. Meanwhile, Sewell's wife grabbed some items from the table, including the gun, and ran to the rear of the apartment.

While the first arresting officer detained Sewell, a back-up officer entered the apartment. The back-up officer followed Sewell's wife to the rear of the apartment and observed her drop something in the direction of the toilet in the bathroom, and then proceed to the bedroom where she placed the gun, the green plant material, and the tin foil packets on the floor. After arresting Sewell's wife, the officers confiscated the gun—a loaded .357 revolver—from the floor of the rear bedroom. They also seized marijuana, PCP, cash, and tin foil packets from the bedroom floor and from the table in the front room. In addition, the officers observed a jar in the toilet which smelled of liquid PCP.

Sewell's version of the events of November 11, 1988, was completely at odds with that of the police officers. Sewell testified that he was at home with his wife, "not breaking any laws," when two police officers knocked on his back door and demanded to be let into the apartment. When Sewell asked to see a search warrant, the officers pulled their weapons and again demanded that Sewell open the door to the apartment. Once inside, Sewell testified that the officers knocked him down, kicked him and searched him, recovering cash and ammunition. The officers then conducted a warrantless search of the entire apartment and recovered a gun from a drawer in Sewell's bedroom. The district court made

findings of fact accepting the police officers' version of the events and rejecting Sewell's.

On September 29, 1989, the Special April 1987 Grand Jury returned an indictment charging Sewell with illegally obtaining and possessing a firearm in violation of Title 18, United States Code, Sections 922(a)(6), 922(h)(1), and 924(c), and with possessing, with the intent to distribute, a Schedule III narcotic drug in violation of Title 21, United States Code, Section 841(a)(1). Sewell filed a motion to suppress the evidence seized at his arrest. After a hearing, the district court denied Sewell's motion. Sewell then pleaded guilty, but reserved the right to appeal the district court's denial of the motion to suppress evidence. Sewell was sentenced to five years imprisonment and three years supervised release. Sewell appealed.

Sewell argues that the district court erred when it failed to sustain his motion to suppress the seized evidence. Sewell maintains that the officers' warrantless entry into his home to effect his arrest violated the fourth amendment stricture against unreasonable searches and seizures. Specifically, Sewell contends that no exigent circumstances existed to justify the officers' entry, and that all evidence seized incident to the arrest should have been suppressed by the district court. We disagree. As the district court properly determined, the arresting officer, having observed a crime being committed by Sewell in the doorway of his apartment, had probable cause to arrest Sewell at that time. Sewell should not be permitted to thwart that arrest by closing the door and retreating to the sanctity of his home.

■ At the outset, we note that a district court's denial of a motion to suppress evidence will not be disturbed unless the decision was clearly erroneous. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citing *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990); *United States v. Ingrao*, 897 F.2d 860, 862 (7th Cir.1990)). Because the district court had the opportunity to hear the testimony and observe the demeanor of the witnesses, its findings are afforded "particular deference." *Id.* (quoting *Edwards*, 898 F.2d at 1276.).

■ Our decision in *United States v. Fleming*, 677 F.2d 602 (7th Cir.1982), is directly on point and controls our determination in the instant case. In *Fleming*, the evidence established that, from April until August of 1980, police officers conducted extensive surveillance of the defendant Fleming's home in Chicago. 677 F.2d at 604. That surveillance indicated that Fleming was distributing cocaine out of his residence. *Id.* On August 8, 1980, the officers observed an individual go to Fleming's door carrying a brown bag folded into a rectangular parcel and secured with rubber bands. *Id.* at 605. When Fleming opened the door, the officers saw Fleming holding a small paper bag. *Id.* At this point, the officers converged on the doorway to Fleming's house. One of the officers put his foot in the door to prevent Fleming from closing the door. *Id.* The officers then went through the door and arrested Fleming. They seized the bag Fleming had been holding; the bag contained cocaine. *Id.*

Fleming made the same argument on appeal that Sewell makes in this case: the warrantless entry of officers into his home was unconstitutional under the rule of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton*, the Supreme Court held that "the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576, 100 S.Ct. at 1375. In *Fleming*, we rejected the argument that Fleming's warrantless arrest violated *Payton*:

Payton is . . . a red herring. The officers here did not make a routine felony arrest of Fleming, without a warrant, in his home. They followed him into his home

after they saw him standing with his front door ajar, engaging in what they reasonably believed to be a drug sale. They followed him into the house only after he attempted to shut the door and flee. The police conduct is governed, not by *Payton*, but by *United States v. Santana*, 427 U.S. 38 [96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)], ... which Fleming neither cites nor distinguishes. In *Santana*, the drug sale had been completed and the police announced themselves and moved to arrest her. She retreated inside. The Supreme Court held that Mrs. Santana was in a public place when the police sought to arrest her, and that "a suspect may not defeat an arrest which has been set in motion in a public place ... by the expedient of escaping to a private place." 427 U.S. at 43 [96 S.Ct. at 2410]....

*Fleming*, 677 F.2d at 608.

The facts here are virtually identical to the arrest in *Fleming*. The arresting officer, posing as a drug purchaser while standing just outside Sewell's door, observed the defendant engage in what he reasonably believed to be a drug sale. The officer could see through the open door all the elements of narcotics trafficking. The officer then announced himself and moved to arrest Sewell. When Sewell retreated into his apartment, the officer pursued Sewell to complete the arrest.

Sewell attempts to distinguish *Fleming* by arguing that he never crossed the threshold of his residence into the hallway. We offer two responses. First, we point out that the holding of *Fleming* is not dependent on whether the defendant crossed the threshold of his home. Indeed, there is no indication that Fleming ever crossed the threshold of his doorway before the officers moved to make the arrest. *Fleming*, 677 F.2d at 605. As the Supreme Court made clear in *Santana*, and as we made clear in *Fleming*, a person has no expectation of privacy when he "knowingly exposes himself to the public, even in his own house or office [and, therefore,] is not a subject of Fourth Amendment protection." *Santana*, 427 U.S. at 42, 96 S.Ct. at 2409 (citing *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). *See also Fleming*, 677 F.2d at 608.

Second, we note that, from the record before us, it appears that Sewell did in fact cross the threshold of his doorway in order to complete the sale of narcotics to the undercover officer. In order to take the money from the officer and hand him the tin foil packet containing "wickie," Sewell effectively had to cross the threshold to trade with the officer, who stood outside the doorway. Thus, Sewell was in a public place when the police sought to arrest him.

Sewell also contends in his brief that the arresting officer was not in a public place when he was standing in the hallway outside Sewell's apartment, but rather was on the "curtilage" of Sewell's home. Appellant's Brief at 4–5. (We note that this argument renders meaningless Sewell's earlier position that he never crossed the threshold of his doorway: if the hallway outside Sewell's door was not a public place, then Sewell's expectation of privacy began at the front door of the building.) We disagree. The evidence presented at the suppression hearing established that the hallway in which the officer stood was indeed a public place: all doors leading to the hallway were open and unlocked, and approximately fifteen people were observed entering and leaving the building within a ten-minute period. Moreover, by voluntarily engaging in a drug sale with the officer, Sewell consented to the officer's presence in the hallway. Thus, Sewell was not in an area where he had any expectation of privacy. *See Katz*, 389 U.S. at 351–52, 88 S.Ct. at 511–12 ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection.... But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.").

Finally, we note that the officers were justified in pursuing Sewell into his apartment to complete the arrest and to prevent the destruction of evidence. Once Sewell

realized that the purchaser to whom he had just sold narcotics was a police officer, there was a realistic expectation that any delay in apprehending Sewell and his wife would result in the destruction of evidence. *See Santana,* 427 U.S. at 43, 96 S.Ct. at 2409. This case involves the same type of "hot pursuit" that long has been sufficient to justify a warrantless entry. *See id.* *See also Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967). The fact that the pursuit here ended almost as soon as it began does not render it any less constitutionally adequate. Thus, once Sewell and his wife were arrested, the search, incident to those arrests, which produced the drugs, the money, and the gun clearly was justified. *Santana,* 427 U.S. at 43, 96 S.Ct. at 2409. *See also United States v. Robinson,* 414 U.S. 218, 224, 94 S.Ct. 467, 471, 38 L.Ed.2d 427 (1973); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969).

For the foregoing reasons, we hold that the district court did not err by denying Sewell's motion to suppress evidence. The judgment of the district court is, therefore,

AFFIRMED.