**UNITED STATES of America,**

v.

**Leo J. TAVOLACCI.**

**Crim. No. 88–238.**

United States District Court, District of Columbia.

Aug. 22, 1988.

John P. Dominguez, Asst. U.S. Atty., Washington, D.C., for U.S.

Allan Palmer, Washington, D.C., for Tavolacci.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

Presently before the Court is defendant's motion to suppress tangible evidence seized from defendant's luggage on May 27, 1988. On July 22, 1988, the Court heard testimony at a suppression hearing. In consideration of the motion, the opposition thereto, the evidence presented at the hearing, and for the following reasons, the Court shall deny defendant's motion to suppress.

## FACTUAL BACKGROUND

The facts involved in this incident are not disputed by the parties. On May 25, 1988, at 7:32 P.M. EST, a Tom Marks made a reservation for a one-way ticket from Deerfield Beach, Florida to Chicago, Illinois. The train's departure time from Florida on May 26, 1988 was 6:06 P.M. The train was scheduled to stop in Washington, D.C. on May 27th at 3:10 P.M. where Mr. Marks was to change trains to commence the completion of the trip to Chicago at 5:55 P.M. The $649.00 ticket, paid for in cash, reserved the most expensive compartment which was usually used by two individuals.

On May 27th, Amtrak Agent Thomas Cook ran a routine computer check of the passengers travelling on the northbound train. Agent Cook is a member of the drug interdiction unit of the Amtrak Police Department which seeks to target potential drug couriers traveling via trains. Based on unusual travel patterns, members identify potential drug couriers for interviews. In the case of Tom Marks the following items alerted Agent Cook as to a potential drug courier: 1) the reservation was made less than 24 hours before departure; 2) the ticket covered one-way travel; 3) the ticket was paid for in cash; 4) the purchase was for one person traveling alone in a large compartment traditionally used by two individuals; 5) the call-back number was not in service; 6) the call-back number, or "home" number, was in Florida yet the passenger was traveling on a one-way ticket to Chicago; and 7) the trip of 40 hours could be traveled more rapidly and cheaply via plane. Based on the foregoing, Agent Cook determined that this individual should be interviewed.

Agent Cook alerted the Metropolitan Police Department's Narcotics Interdiction Unit that a potential drug courier was arriving in Union Station. Pending the arrival of the police officers, Agent Cook observed defendant, identified by a train attendant as Tom Marks, disembark the train carrying a large grey suitcase. Defendant, after entering Union Station, checked his suitcase with the baggage room and left the station.[1] Agent Cook verified that the suitcase was in the room.[2] Agent Cook continued to stake out the baggage room awaiting the arrival of Detectives Hanson and Beard of the Metropolitan Police Department who joined Agent Cook at 5:05 P.M. The officers observed defendant return and retrieve his luggage at approxi-

---

1. Both Agent Cook and Detective Beard testified that defendant's leaving his suitcase in the baggage claim area did not fall within the typical drug courier profile.

2. Agent Cook testified that he did not attempt to conduct a canine sniff while the suitcase was in the baggage area. He also testified that even when the officers from the Metropolitan Police Department arrived and joined him near the baggage area, he did not attempt to get a dog to conduct a sniff of the suitcase as he could have at anytime during the wait for defendant's return.

mately 5:20 P.M.[3] They followed defendant back onto the train.

When the officers, all in plainclothes and without displaying weapons, approached the train compartment, defendant was situating himself. Detective Beard approached the open door and after identifying himself, requested defendant's permission to ask some questions. Defendant replied "sure." In response to Det. Beard's request for his ticket, defendant displayed a ticket in the name of Tom Marks. Det. Beard inquired whether defendant had a photo identification. Defendant asked what the questioning was concerning. Det. Beard indicated that he was with the drug interdiction unit investigating drug carriers. He then requested the identification again. Defendant's facial expression changed and his mouth visibly dropped as he produced an Illinois driver's license in the name of Leo Tavolacci. Without any police inquiries concerning the discrepancy between the name on the ticket and his driver's license, defendant immediately launched into an explanation. Defendant indicated that a friend had purchased the ticket and could not spell his name so he used "Tom Marks." Det. Beard returned the ticket and asked why defendant had been in Florida. Defendant responded he was visiting for pleasure. Det. Beard returned the license to defendant and asked if defendant had any drugs in his suitcase. Defendant replied in the negative. Det. Beard then asked defendant if he would consent to a search of the suitcase. Defendant responded, "No, I'd rather not." Defendant responded in a like manner to a request for consent to a canine sniff.

At this point, Det. Beard ordered defendant off of the train onto the platform and directed him to bring his suitcase in order that he might conduct a canine sniff. As far as Det. Beard was concerned, the interview with defendant was over and only the canine sniff remained to be conducted.[4] Agent Cook testified that at this point there were approximately 15 to 20 minutes until the train departed. Det. Beard went to get the narcotics dog, leaving defendant on the platform with Agent Cook and Det. Hanson. Defendant was pacing and fidgeting and requested if he could leave. Agent Cook indicated that the narcotics dog would be there soon and then defendant could return to the train. About 10 minutes before the train was scheduled to depart, the narcotics dog still had not come to the platform. Therefore, Det. Hanson left to check on the dog's whereabouts leaving Agent Cook alone with defendant on the platform. Defendant, who was still pacing nervously, asked Agent Cook if he was with the police. After Agent Cook responded that he was with the railway police, defendant asked if he could give Agent Cook some personal "stash" that he had in his suitcase and just leave. Agent Cook asked how much and received a response of "a quarter." At this point, Agent Cook directed defendant to pick up his suitcase and follow him to his office. Following defendant's admission, Agent Cook clearly had probable cause to arrest defendant. In fact, Agent Cook testified that he considered defendant to be under arrest. Agent Cook did not formally arrest defendant, however, because of the officer's concern for his safety as well as the safety of others on the platform.

On the way back to the office, Agent Cook and defendant were met by the police dog and his handler.[5] When the dog initial-

---

3. The train was scheduled to depart for Chicago at 5:55 P.M.

4. Detective Beard testified that he did not consider bringing the narcotics dog onto the train because he thought that it was easier for the dog to conduct the sniff while on the platform. In fact, Det. Beard testified that it was his policy to order the passenger and his suitcase onto the platform to conduct a canine sniff. *Compare, United States v. Whitehead*, 849 F.2d 849, 852–53 (4th Cir.1988) (officers brought narcotics dogs directly onto train); *United States v. Liberto*, 660

F.Supp. 889, 890 (D.D.C.1987), *aff'd*, 838 F.2d 571 (D.C.Cir.1988) (same), *with, United States v. Carrasquillo*, 670 F.Supp. 49, 50 (D.D.C.1987) (agents removed luggage to platform to conduct canine sniff, without defendant's objection, and defendant voluntarily accompanied officers onto platform).

5. Both Agent Cook and Det. Beard testified that the train had not departed by the time the dog arrived. Det. Beard indicated that approximately 15 minutes had elapsed between defendant's removal from the train and the arrival of the

ly sniffed the luggage, he did not alert that there were drugs in the suitcase.[6] Detective Hanson then ordered defendant to open the suitcase. Defendant opened the bag by unlocking the suitcase at either end with a key and undoing the combination lock in the center. Once the suitcase was open, the dog alerted. A subsequent search revealed that the suitcase contained 13 kilograms of a substance which subsequently was identified as cocaine valued at several hundred thousand dollars. At this point, the officers formally arrested defendant.

## DISCUSSION

### I. *Initial Questioning of Defendant*

■ Initially, the Court must determine whether defendant was seized for purposes of the fourth amendment when the officers first approached defendant for questioning while defendant was in his compartment on the train. The fourth amendment does not protect individuals from every governmental intrusion on their expectation of privacy, only those intrusions which are unreasonable. *See United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed. 2d 538 (1977) (warrantless search of contents inside locked footlocker found to violate privacy interests and was not justified by exigent circumstances). Consensual police-citizen encounters in which police officers approach a citizen requesting voluntary responses to inquiries and eliciting answers are not seizures under the fourth amendment. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *Gomez v. Turner*, 672 F.2d 134, 144 (D.C.Cir.1982).

In the present case, the Court finds that the officers' initial questioning of defendant was permissible. Based upon an extensive list of factors, *supra* at 2, the officers were acting within the parameters of their powers to stop individuals and interview them if such questioning is consensual. In this case, defendant agreed to answer question posed by the officers.

### II. *Terry Stop of Defendant and Detention of his Suitcase*

■ Mere encounters, however, may escalate to detentions to which fourth amendment rights attach. In order to detain an individual on less than probable cause, the police must have "specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Absent this articulable suspicion, a detention on less than probable cause would violate the fourth amendment. Furthermore, to avoid violating the fourth amendment, a valid *Terry* stop "must be temporary and last no longer than necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. at 500, 103 S.Ct. at 1325.

Under *Terry* and its progeny, an officer also may detain briefly a traveler's luggage which he has a reasonable suspicion contains narcotics. *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). The officers may subject the luggage to a canine sniff which the United States Supreme Court has determined is not so intrusive as to constitute a search for fourth amendment purposes. *Id.* at 707, 103 S.Ct. at 2644. The canine sniff, however, must be conducted within certain parameters such that it is not a lengthy detention of the luggage and it does not delay the course of the passenger's travel. *Compare id.* at 707–10, 103 S.Ct. at 2644–46 (detaining passenger's luggage for 90 minutes found to be too lengthy and amounted to seizure which required probable cause) *with United States v. Sharpe*, 470 U.S. 675, 688, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) (approving 20 minute detention of luggage to conduct canine sniff).

---

dog. Agent Cook testified that about 10 to 15 minutes had elapsed.

**6.** The police testified that defendant's aluminum suitcase was of the variety that is known to be virtually air tight essentially foreclosing the escape of air for the dog to detect.

In this case, in the course of the consensual questioning, the officers discovered that defendant was traveling under an alias which he attempted to explain without any inquiries from the officers. They also observed defendant's nervousness and facial expressions. Given the correlations between defendant's travel patterns and the drug courier profile as well as the actual observations of defendant, the officers possessed a reasonable articulable suspicion that justified detaining defendant.

■ In response to Det. Beard's question whether defendant was carrying drugs, defendant answered in the negative. Defendant also refused his consent to both a search of his luggage as well as a canine sniff of his bags. At this point, Det. Beard ordered defendant off of the train with his suitcase stating that he was going to conduct a canine sniff of defendant's luggage. Det. Beard indicated at the suppression hearing that he wanted to conduct the canine sniff on the train platform to avoid inconveniencing other travelers boarding the train. He also testified that he did not want to separate defendant from his luggage by permitting defendant to remain on the train while removing his luggage to the platform. Det. Beard testified that, as far as he was concerned, the interrogation of defendant, himself, was complete and all that remained was to conduct the dog sniff.

The Court is cognizant of the overlap of an individual's own liberty interest and his possessory interest in his luggage such that the police might be inclined to detain an individual, for whom the officers no longer have any questions, while securing a dog to conduct a sniff of his luggage. See Florida v. Royer, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1982) (stating that government had "adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions") (emphasis added); United States v. Place, 462 U.S. at 708, 103 S.Ct. at 1587 ("in the case of detention of luggage within the traveler's immediate possession, the police conduct intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary."). The Court merely notes that in other circumstances where officers have completed the questioning of a citizen, the officers informed the defendant that he is free to leave or to stay while the officers conduct a canine sniff of the individual's luggage. If the individual chooses to leave, the officers make arrangements for the return of the luggage. If the individual elects to remain with his luggage, the police should conduct the canine sniff expeditiously to avoid interfering with the passenger's travel plans. See, e.g., United States v. Alpert, 816 F.2d 958, 959 (4th Cir.1987) (officers inform plane traveler he is free to leave but officers were detaining his bag for a canine sniff); United States v. West, 731 F.2d 90, 91 (1st Cir.1984) (officers indicated they would conduct canine sniff and informed defendant he could remain or leave), cert. denied, 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985); United States v. Puglisi, 723 F.2d 779, 782 (11th Cir.1984) (same). Furthermore, the court notes that in a number of canine sniff cases involving trains the officers have brought the narcotics dog directly onto the train. See, supra, note 4 (citing cases). The Court is wary of setting bright-line procedures by which the drug interdiction unit must operate. The nature of the work that the unit performs requires a large degree of flexibility in investigating drug trafficking. As such, the Court declines to require officers, once they have completed their interrogation of defendant, to conduct canine sniffs only on the train. See United States v. Alpert, 816 F.2d at 963–64 (Fourth Circuit refuses to adopt per se rule that police keep narcotics dogs at airport whenever they are observing for drug couriers). While the police procedures in this case may have been less than ideal, the Court determines that, based on the officers knowledge and observations, the detention of defendant and his luggage to conduct a canine sniff was appropriate. As such, defendant's voluntary statement concerning his "stash" is constitutionally valid.

## III. Arrest of Defendant

■ Because the voluntary statement was not the product of an illegal detention, cf. *Florida v. Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 ("statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of illegal detention and not the result of an independent act of free will"), the Court finds that defendant's statement legitimately provided the officer with probable cause to arrest defendant. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (probable cause exists when facts and circumstances within police officer's knowledge would "warrant a prudent man in believing that petitioner had committed or was committing an offense"). Agent Cook testified that as far as he was concerned, upon defendant's utterance, defendant was under arrest. Agent Cook, however, fairly and reasonably did not place defendant under arrest immediately because he was fearfully for his own safety, as the sole law enforcement officer on the platform with defendant, as well as the safety of others on the platform. *See United States v. Roper,* 681 F.2d 1354, 1358 (11th Cir.1982) ("peril created by attempting to arrest a suspected drug dealer in a [hotel] hallway ... while bystanders looked on sufficiently established exigent circumstances to justify returning [defendant] to his room"), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1197, 75 L.Ed.2d 440 (1983)).

## IV. Search of the Suitcase

The narcotics dog, its handler and Det. Hanson met Agent Cook and defendant while they were walking back to the station. The group proceeded to the apron area between the platform and the entrance to the station. The officer let the dog loose on the suitcase. The dog failed to alert on any drugs. At this point, Det. Hanson directed defendant to open his locked suitcase. Upon defendant's opening of the suitcase and its opening, the dog alerted. In a search of the bag, the officers found the cocaine. The officers then formally arrested defendant.

One of the most basic constitutional rights assured by the fourth amendment is freedom from warrantless searches. So strong is this tenet that the United States Supreme Court has stated that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.' " *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971) (footnotes omitted) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). In this case, the government contends that the search incident to arrest exception applies to excuse the warrantless search of defendant's suitcase. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

■ Initially, the Court notes that the failure to officially arrest defendant until after the search does not affect this Court's approach to the search incident to arrest issue. Specifically,

[w]here the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than visa versa [as long as] .... the fruits of the search of petitioner's person were, of course, not necessary to support probable cause to arrest petitioner.

*Rawlings v. Kentucky,* 448 U.S. 98, 111 & n. 6, 100 S.Ct. 2556, 2564 & n. 6, 65 L.Ed.2d 633 (1980); *see United States v. Thornton,* 733 F.2d 121, 128 n. 9 (D.C.Cir.1984) (affirming initial search of defendant prior to formal arrest because probable cause to arrest existed before search began). In the present case, the police clearly possessed probable cause to arrest defendant before the search. Immediately following the search, the officers formally arrested defendant. Accordingly, pursuant to the case law and the facts of this case, the timing of the arrest viz a viz the search is unimportant and not determinative of the search incident to arrest issue.

■ The exact parameters of the area within which a police officer may conduct a search incident to arrest are not defined precisely. The search incident to arrest exception permits warrantless searches of the arrestee's person and the area within the arrestee's immediate control. *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). The exception is grounded in the practical concern to avoid the arrestee's grabbing a weapon or destroying evidence. *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977).

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Id.* (footnotes omitted).

Prior to 1977, a number of lower courts upheld searches incident to arrests where the search occurred at a time and place remote to the arrest or at a time when the arrestee virtually had no chance of gaining access to a weapon or evidence. *See, e.g., United States v. Mason*, 523 F.2d 1122, 1125–25 (D.C.Cir.1975) (upholding as incident to arrest search of closet within three to four feet of handcuffed defendant); *United States v. Battle*, 510 F.2d 776, 778–79 (D.C.Cir.1975) (upholding warrantless search at police station of shopping bag as incident to arrest); *United States v. Eatherton*, 519 F.2d 603, 610–11 (1st Cir.) (upholding as incident to arrest search of briefcase after arrestee was handcuffed on in police custody), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975). *See generally* 2 W. LaFave, *Search and Seizure* § 5.5(a) at 531 n. 16 (2d ed. 1987) (citing cases). In 1977, however, the Supreme Court ruled that warrantless searches of luggage seized from an arrestee are invalid if they are remote in time or place from the arrest or no exigency exists. *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977). The *Chadwick* Court indicated that once the suitcase is reduced to the officer's "exclusive control" and there is no danger that the arrestee will gain access to weapons or destroy evidence, the exception for searches incident to arrests is no longer applicable. *Id. Chadwick*, however, did not assist lower courts in defining the limits on searches of containers incident to arrests.[7]

The United States Supreme Court again addressed the scope of a search incident to arrest in *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The Court upheld, pursuant to the incident to arrest exception, the search of the pocket of a jacket in a car from which the arrestee had been removed. The *Belton* court established a bright-line rule that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S.Ct. at 2864. (footnotes omitted). Significantly, the Supreme Court held that the police may inspect any container, whether opened or closed, found within the passenger compartment of the automobile. *Id.* at 460–61, 101 S.Ct. at 2864. The court noted that "the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies that infringement of any privacy interest the arrestee may have." *Id.* at 461, 101 S.Ct. at 2864.

Following the *Belton* opinion, a number of lower courts have upheld, pursuant to the incident to arrest exception, non-automotive searches of containers, whether opened or closed. *See, e.g., United States v. Herrera*, 810 F.2d 989, 990 (10th Cir. 1987) (in theft of mail case where police officers followed trace letter to arrestee's possession, Tenth Circuit, citing *Belton*, upheld search of briefcase as incident to ar-

---

7. Following *Chadwick*, the Supreme Court specifically declined to address the parameters of an incident to arrest search of a container. *Arkansas v. Sanders*, 442 U.S. 753, n. 11, 99 S.Ct. 2586, n. 11, 61 L.Ed.2d 235 (1979). *See generally* 2 W. LaFave, *supra*, at 533–34 (discussing lower courts' interpretations of *Chadwick* as applied to searches of containers).

rest); *United States v. Litman*, 739 F.2d 137, 139 (4th Cir.1984) (in non-automotive circumstances, Fourth Circuit relies on *Belton* to uphold as incident to arrest search of arrestee's shoulderbag because search was contemporaneous with arrest and shoulderbag was within defendant's reach); *United States v. Fleming*, 677 F.2d 602, 607–08 (7th Cir.1982) (in non-automotive case, Seventh Circuit, citing *Belton*, upheld as incident to arrest search of paper bag that occurred after arrestee was handcuffed); *United States v. Brown*, 671 F.2d 585, 587 (D.C.Cir.1982) (per curiam) (applying *Belton* to non-automotive situation). This Circuit has indicated on which facts the Court should focus when considering a search incident to arrest issue.

> [T]he *Belton* reasoning, interpreting *Chimel*, requires courts to focus on *whether the search in question was undertaken as an integral part of a lawful custodial arrest*, not on whether the arrest occurs on the street or in or outside a car, or the quality of the container seized and searched, or whether the suspect held the item in his grasp or could have reached for it at the moment of the arrest. So understood, *Belton* covers cases such as this one in which the search is contemporaneous with a lawful custodial arrest and is confined to containers in hand or within reach *when the arrest occurs.*

*United States v. Brown*, 671 F.2d at 587 (footnote omitted) (emphasis added).

The United States Court of Appeals for the Sixth Circuit, in interpreting *Belton* in a non-automotive situation, indicated that a reviewing court must first place itself in the officer's position to determine whether, when the arrestee was *initially* picked up, the container was within grabbing distance. *United States v. Fleming*, 677 F.2d at 607.[8] Secondly, the reviewing court must determine if the *Chimel* search was unreasonable. *Id.* In *Fleming*, the Sixth Circuit upheld the search of a paper bag in the immediate area of defendant at the time of his arrest despite the fact that at the time of the search defendant was handcuffed. The *Fleming* court found that the search

was not unreasonable despite the presence of police reinforcements and the handcuffing of defendant.

In the present case, defendant had admitted to possession of drugs. Upon that admission, the officer had probable cause to arrest defendant. For the purposes of the fourth amendment analysis, defendant was under arrest. Due to the existence of probable cause, this was a lawful arrest. Incident to that arrest, the officers may search defendant's person and containers within his reach at the time of his arrest. Agent Cook considered defendant to be under arrest on the platform as he and defendant proceeded back to the station. The Court concurs in this evaluation. Defendant clearly was not free to leave. As Agent Cook and Defendant walked back to the station, defendant was carrying his suitcase. Clearly, the luggage was within reaching distance. Furthermore, when defendant was just outside Union Station, he was sufficiently near the suitcase and the suitcase was adequately associated with defendant's person, for the search to be justified by the search incident to arrest exception.

### CONCLUSION

Based on the foregoing, the Court determines that defendant legitimately was under arrest at the time of the search of his luggage. As such, the officers were entitled to conduct a search incident to the arrest. In this case, the search did not exceed the parameters of a lawful search. Accordingly, the Court shall deny defendant's motion to suppress.

### ORDER

In consideration of defendant's motion to suppress, the opposition thereto, and for the foregoing rationale, it is

ORDERED that defendant's motion to suppress shall be denied.

---

8. The Sixth Circuit indicated that where a arrestee occupied a car, this initial inquiry is not

required due to the bright line rule in *Belton*. *United States v. Fleming*, 677 F.2d at 607 n. 14.